Argued and submitted November 30, 1992, affirmed August 4, 1993

## STATE OF OREGON,
*Respondent,*

*v.*

## TIMOTHY JOSEPH PAVELEK,
*Appellant.*

## (90040799; CA A69962)

857 P2d 863

Sally L. Avera, Public Defender, Salem, argued the cause and filed the brief for appellant.

Ann M. Feusse, Certified Law Student, Salem, argued the cause for respondent. With her on the brief were Charles S. Crookham, Attorney General, Virginia L. Linder Solicitor General, and Janet A. Metcalf, Assistant Attorney General, Salem.

Before Rossman, Presiding Judge, and De Muniz and Leeson,* Judges.

ROSSMAN, P. J.

* Leeson, J., *vice* Buttler, J., retired.

## ROSSMAN, P. J.

Defendant appeals his two convictions for possession of a controlled substance, ORS 475.992(4), assigning error to the trial court's denial of his motion to suppress. We affirm.

The parties do not dispute the facts giving rise to the suppression issue. At approximately 2 a.m. on February 17, 1990, Officers Struble and Opel, while on a routine patrol, saw a car parked on the side of a public road near the driveway of a residence. It was facing oncoming traffic. A person, later determined to be the owner of the residence, motioned to the officers as they went by. The officers noticed that the car's two occupants appeared to duck down when the officers drove by. The officers turned around and pulled up in front of the car so that the vehicles were facing nose to nose, roughly 20 feet apart. They did not activate the overhead lights, but did turn on the high beam headlights to illuminate the interior of the other car.

As the officers approached the car, they saw defendant in the driver's seat and his wife in the passenger seat. Struble also saw a .22 caliber rifle in the back portion of the car behind defendant's wife. He asked defendant if the rifle was loaded, and defendant responded that it was not. Struble then asked defendant if he could examine the rifle. Defendant handed the rifle to him and, upon inspection, Struble found 15 to 20 rounds inside the magazine.

Struble asked defendant if there were any other weapons in the car. Defendant said that there were. He removed a loaded .357 Smith & Wesson revolver "from between his wife's two purses and the front seat," unloaded it and handed it to Struble. At this point, Struble was "getting a little bit nervous because of all the guns." He asked defendant and his wife to step out of the car so that he could conduct a quick "pat-down" search "strictly for [his] own safety as well as * * * Opel's, and the [owner of] the residence [who] was standing outside also." The owner told Opel that defendant and his wife had a flat tire and that he had permitted them to use his telephone to call for assistance. Opel shined his flashlight on the car's tires and saw that the left front tire was flat.

Defendant stepped out of the car and Struble searched him for weapons. He felt a "hard heavy object" in the left hip pocket of defendant's coat. Thinking that it might be "a real small caliber handgun," Struble removed the object and discovered that it was a metal hashish pipe about four inches long.

Struble continued searching defendant for weapons. In defendant's right breast shirt pocket, he felt a "puffy soft thing [that] kind of rattled like plastic." He asked defendant if it was his "stash," referring to any narcotics that defendant might have been holding. Defendant responded that it was. Struble then asked if he could retrieve it, and defendant said that he could. Struble pulled out two plastic baggies and a plastic tube barrel of an ink pen. The baggies appeared to contain marijuana. Struble shined his flashlight in the pen barrel and observed a white powdery substance that he believed was methamphetamine.

The assistance that defendant had called for arrived and, presumably, helped defendant repair the tire. Shortly thereafter, defendant and his wife left. The officers retained the baggies and the pen barrel to analyze their contents. Laboratory tests confirmed that the baggies contained marijuana and that the pen barrel contained methamphetamine. Defendant was subsequently arrested and convicted on two counts of possession of a controlled substance.

On appeal, defendant's sole contention is that the trial court should have suppressed all evidence arising out of the encounter with the officers as the product of an illegal "stop" under ORS 131.605 to ORS 131.625,[1] and an unreasonable "seizure" of the person under Article I, section 9, of the Oregon Constitution.[2]

---

[1] ORS 131.615 provides, in relevant part:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry."

A "stop" is defined as "a temporary restraint of a person's liberty by a peace officer lawfully present in any place." ORS 131.605(5).

[2] Article I, section 9, of the Oregon Constitution, provides, in relevant part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; * * *."

■ ■    In *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991), the Supreme Court identified three categories of official interference with a citizen's liberty: (1) a police-citizen "encounter," which does not result in any restraint of liberty and requires no justification; (2) a "stop" under ORS 131.605, which results in a temporary restraint of a citizen's liberty and is justified by a reasonable suspicion of criminal activity; and (3) an "arrest," justified only by probable cause.[3] Only the last two categories are "seizures" of the person under Article I, section 9. 311 Or at 407; *see also State v. Gerrish*, 311 Or 506, 511, 815 P2d 1244 (1991).

■    We note at the outset that the officers permissibly initiated contact with defendant. They saw a car improperly parked on the roadside at 2 a.m. and a person standing by road motioning to them as they drove by. Both by responding to a citizen's motioned request that they pull over, and by observing the car and then stopping and talking with its driver, Struble and Opel were performing their duties as police officers.

Defendant does not contend that the officers' initial contact with him was improper. Rather, he asserts that the "encounter" escalated into a "stop" when Struble asked him to step out of the car, and that, at that time, Struble did not have a reasonable suspicion that defendant had committed a crime. The state argues that Struble's actions were justified on the basis of officer safety concerns. On these facts, we agree with the state.

■    In *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987), the Supreme Court held

> "that Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen

---

The Supreme Court has recognized that a "stop" under ORS 131.615 is a "seizure" of the person for purposes of Article I, section 9. *State v. Holmes*, 311 Or 400, 408 n 18, 813 P2d 28 (1991).

[3] The three categories "are guidelines only. They are neither exhaustive nor conclusive as to what police action is a 'seizure' of the person." *State v. Holmes, supra*, 311 Or at 407.

might pose an immediate threat of serious physical injury to the officer or to others then present."

We conclude that, before and during the non-seizure police-citizen "encounter," Struble perceived facts sufficient to support a reasonable suspicion that defendant posed an immediate threat to Struble and to the others present. When the officers first drove by defendant's car, they saw the owner of the residence motion to them and noticed defendant and his wife apparently crouch down to avoid being seen. Upon approaching defendant's car and engaging him in conversation, Struble discovered that defendant had two loaded, high-powered firearms in the car and reasonably assumed that he might have additional firearms concealed in the car or on his person. Struble testified at the suppression hearing that on "numerous other [occasions he had] found from one to five weapons inside vehicles." Further arousing Struble's fear was the fact that defendant had falsely represented that the .22 caliber rifle was not loaded when, in fact, it contained 15 to 20 rounds of ammunition. Under the facts of this case, we believe that Struble reasonably perceived an imminent danger to himself, to Opel, and to the owner of the residence. He was, therefore, clothed with authority to take reasonable steps to ensure their safety. Under these circumstances, the officers were not required to turn away and stroll off into the night as potential targets.

■      We find the protective measures Struble chose to have been reasonable under the circumstances. As the Supreme Court stated in *State v. Bates, supra*, 304 Or at 524,

"it is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry is therefore limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made."

Asking defendant to step out of the car, conducting a "pat-down" search of defendant for weapons and removing from his pocket a hard object that turned out to be a hashish pipe

were reasonable safety measures "under the circumstances as they reasonably appeared" when the decision was made. Accordingly, we conclude that defendant was not impermissibly "seized" under Article I, section 9, or illegally "stopped" under ORS 131.615, when he was asked to step out of his car and subjected to a search of his outer clothing.[4]

■■ We must now determine whether the seizure of the two plastic baggies and the pen barrel was permissible. As previously discussed, Struble was entitled to conduct a "patdown" search of defendant for weapons. During the course of that search, Struble found a hashish pipe. As the frisk continued, he felt a "puffy soft" object in defendant's shirt pocket that he reasonably believed contained illegal narcotics "to go with the [hashish] pipe." Defendant confirmed Struble's belief when he told Struble that he had his "stash" in that pocket.[5] Struble asked defendant if he could remove the "stash" from the pocket. Defendant responded affirmatively. Struble then reached into the pocket and retrieved the items that were the subject of defendant's motion to suppress.[6] The trial court concluded:

"[Defendant] did consent to removal of the objects from his breast pocket. There is no contention or evidence to contradict that [his] consent was voluntary."[7]

Although we are not bound by the trial court's legal conclusion that defendant's consent was voluntary, *State v. Ledbetter*, 95 Or App 187, 190, 768 P2d 431 (1989), we believe that, on this record, the court's conclusion was correct. Accordingly, we hold that the seizure of the contents of defendant's pocket was lawful.[8]

Affirmed.

---

[4] The principles enunciated by the Supreme Court for determining whether there has been an unauthorized "seizure" of the person under Article I, section 9, are also applied when deciding whether there has been an illegal "stop" under ORS 131.615. *See State v. Underhill,* 120 Or App 584, 587 n 1, 853 P2d 847 (1993).

[5] Defendant did not argue below, nor does he argue on appeal, that asking him if the object in his shirt pocket was his "stash" was an impermissible inquiry.

[6] Defendant does not challenge the confirmatory testing of the contents of the baggies and the pen barrel.

[7] Defendant did not argue below that he did not consent to the intrusion into his pocket or that his consent to that intrusion was involuntary.

[8] Defendant has presented no separate argument that his federal constitutional rights were violated.