Argued and submitted July 31, 2008, reversed and remanded on Count 2;
otherwise affirmed January 28, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHRISTOPHER MATTHEW QUALE,
*Defendant-Appellant.*

Marion County Circuit Court
04C55009; A132610

201 P3d 273

Travis Eiva, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Ryan Kahn, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Tiffany Keast, Assistant Attorney General.

Before Rosenblum, Presiding Judge, and Brewer, Chief Judge, and Richardson, Senior Judge.

ROSENBLUM, P. J.

## ROSENBLUM, P. J.

Defendant was convicted of two counts of possession of a controlled substance. *Former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005). On appeal, he assigns error to the trial court's denial of his motion to suppress evidence of opium discovered in a piece of foil in his jacket pocket and methamphetamine discovered in his backpack. Both items were discovered after defendant consented to being searched for weapons. Defendant argues that the arresting officer exceeded the scope of his consent by opening the piece of foil after having received defendant's permission to remove it from his pocket. He contends further that the discovery of the methamphetamine was a product of exploitation of the unlawful search of the foil. We conclude that the trial court should have suppressed evidence of the opium but not evidence of the methamphetamine.

The following facts are not in dispute. Salem Police Officer Cook was driving his patrol car at about 4:15 in the morning when he saw defendant walking on the side of the road. Defendant was wearing a jacket and a backpack. Cook had no reason to believe that defendant was involved in any criminal activity, but, given the time of day, he decided to make contact with defendant. He parked his car and asked defendant if he could talk to him. Defendant came over to where Cook was parked. Cook told defendant that he was free to leave and did not have to talk to him, but defendant agreed to talk. According to Cook, defendant was polite and friendly but appeared to be nervous. He told Cook that he could not sleep and had decided to take a walk. A conversation ensued about a wrist brace defendant was wearing and about the fact that there were raccoons in the area.

At some point, Cook asked defendant if he would consent to a search for weapons.[1] Defendant consented and told Cook that he had rocks in his pocket to throw at the

---

[1] Cook did not expressly testify that he asked defendant to consent to a search *for weapons.* The prosecutor asked Cook, "[W]hen you asked him if he had any weapons and would he consent to a search, did he agree to that?" Cook responded, "Yes." The parties agree that both Cook and defendant understood Cook's request to be a request for consent to search for weapons. We accept the parties' view of that fact.

raccoons. Before looking in each of defendant's pockets, Cook asked if it was okay to "look in" that area, and defendant consented each time. In one of the outer pockets of defendant's jacket, Cook noticed what he described as "a small piece of foil." He asked defendant if he could remove it, and defendant replied, "Sure." Cook took the foil out of the pocket and unfolded it, revealing a dark brown substance that Cook believed to be a controlled substance.

Cook read defendant his *Miranda* rights and asked if he understood his rights and had any questions about them. Defendant did not have any questions. Cook then asked defendant about the substance in the foil. Defendant admitted that it was opium.

■        Cook then asked defendant for permission to search his backpack. Defendant said, "Sure, no problem." Among the items in the backpack was a metal spoon that appeared to have drug residue on it. Cook performed a field test that indicated the presence of opiates. Cook took defendant into custody and transported him to jail.[2]

Laboratory testing confirmed that the substance in the foil was opium and determined that the spoon had methamphetamine residue on it. Defendant was charged with two counts of possession of a controlled substance. Before trial, he moved to suppress the evidence of the controlled substances. The trial court denied the motion and, after a stipulated facts trial, found defendant guilty on both counts.

---

[2] At some point during the encounter, Cook called for backup. After backup arrived, a total of three officers were on the scene. The record does not indicate when backup arrived or what, if anything, the two other officers did. However, the record of the suppression hearing is incomplete. Evidently because of a recording equipment failure, not all of defendant's re-cross-examination of Cook was recorded. Defendant argues that the arrival of backup may have constituted a sufficient show of authority to transform the encounter into an unlawful stop. He contends that "vital facts" pertaining to the circumstances surrounding the arrival of backup may have been elicited in the testimony that was not recorded. Accordingly, he urges us to reverse and remand for a new suppression hearing under ORS 19.420(3).

To justify an exercise of our discretion to order a new hearing under ORS 19.420(3), an appellant must make "at least a prima facie showing of error, or unfairness in the trial, or that there had been a miscarriage of justice." *State v. Acremant*, 338 Or 302, 339, 108 P3d 1139, cert den, 546 US 864 (2005) (citation omitted). Defendant has not made such a showing. Accordingly, we decline to exercise our discretion to order a new suppression hearing.

On appeal, defendant assigns error to the denial of the motion to suppress, arguing that Cook violated his rights under Article I, section 9, of the Oregon Constitution, which prohibits unreasonable searches and seizures. He argues that the evidence of the opium and the methamphetamine must be suppressed. We begin with the evidence of the opium.

Defendant argues that Cook's act of unfolding the foil that contained the opium constituted an unlawful search because it exceeded the scope of his consent. He argues that Cook's original request for consent was to search for weapons and that it is thus not reasonable to infer that his subsequent consent to look in the pocket and remove the foil included consent to open the foil.

The state responds that, for two reasons, Cook's opening of the foil did not exceed the scope of defendant's consent. First, the state argues that, because Cook initially asked for consent to search defendant for weapons, and defendant consented without limitation, the scope of his consent included anything on his person or in his backpack that could hold a weapon. According to the state, a reasonable person could believe that the foil in his pocket was capable of containing a weapon such as a razor blade, a shard of glass, or a needle. Thus, argues the state, defendant's consent extended to searching the foil. Second, the state contends that Cook's request to "remove" the foil from defendant's pocket must be understood in the context of the initial express request for consent to *search* defendant. It asserts that a reasonable person in those circumstances would have understood that Cook wanted to remove the foil so that he could search it. Thus, argues the state, defendant's consent to the removal of the foil must be understood to include consent to open it. The state goes on to argue that, even if defendant's initial consent did not extend to opening the foil, he manifested consent to the search by remaining silent in the face of Cook's activity.

Normally, for a search to be permissible under rticle I, section 9, the police must have a search warrant. *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994). However, a warrantless search is reasonable if it falls within one

of the recognized exceptions to the warrant requirement. Consent is one such exception. *Id.*

> "When the state relies on consent to support a search, it must prove by a preponderance of the evidence that officials complied with any limitations on the scope of the consent. The scope of a person's consent does not turn on what the person subjectively intended. Rather, it turns on what a reasonable person would have intended. The specific request that the officer made, the stated object of the search, and the surrounding circumstances all bear on our determination of the scope of a person's consent."

*State v. Fugate*, 210 Or App 8, 13, 150 P3d 409 (2006) (citations omitted). Generally, when a police officer specifies the subject of a search, "the scope of [the] consent * * * should be interpreted to include those areas where the items that are the subject of the search might be found." *State v. Arroyo-Sotelo*, 131 Or App 290, 297, 884 P2d 901 (1994).

■　　　We begin by considering whether defendant's initial consent to be searched was sufficiently broad to include opening the foil. It is undisputed that a reasonable person would have understood Cook's initial request as a request for consent to search for weapons. Because defendant placed no limitations on his consent, we interpret his consent to include any place that weapons might be found. Thus, his consent extended to opening the foil only if, in the eyes of a reasonable person, the foil could have contained a weapon.

　　　The record before us does not establish that the foil could have contained a weapon. Officer Cook's testimony about the foil was limited to his statement that it was "a small piece of foil." The state concedes that the record does not indicate the dimensions of the foil. Given the lack of any evidence as to the size or shape of the foil, we cannot conclude that a reasonable person could believe that it might contain a weapon. Thus, there is no basis on which we can conclude that defendant understood that Cook's request for consent to search for weapons included a request to search the foil. It follows that defendant's consent to a search for weapons did not extend to allowing Cook to open the foil.

We next consider whether defendant's subsequent consent to having Cook remove the foil from his pocket constituted consent for him to open it. As noted, the state contends that defendant's consent must be understood in the context of Cook's initial express request for consent to *search* defendant. According to the state, a reasonable person would have understood that Cook intended to search defendant and, thus, that he wanted permission to remove the foil from defendant's pocket so that he could search it.

The problem with the state's argument is that it takes a truncated view of the context. The initial request for consent was not merely a request for consent to *search* defendant, as the state contends; it was a request to search him *for weapons*, as the state acknowledged in its first argument. As we explained above, there is no evidence indicating that the foil could have contained weapons, so there is no reason to believe that a reasonable person would have understood that Cook wanted to remove the foil for the purpose of searching it for weapons.

We turn briefly to the state's argument that defendant manifested consent by remaining silent when Cook began to open the foil. In support of its argument, the state asserts that there is "no indication that defendant could not see what the officer was doing[,] * * * that he had no opportunity to object, or that such an objection would have been unavailing." The problem with the state's position is that, assuming, without deciding, that defendant's silence could constitute consent, the state's view of the record does not take into account the burden of proof. Searches for weapons commonly occur with the officer standing behind the person being searched. Although it is true that there is no indication in the record that Cook was standing behind defendant, that defendant could not see what Cook was doing when he opened the foil, or that he otherwise had no opportunity to object, the record also does not disclose that defendant *was* able to see what Cook was doing. Cook did not testify about where he and defendant were standing relative to each other when he opened the foil or about whether defendant could see what he was doing. The lack of evidence in the record on that issue cuts against the state. *See State v. Jacobsen*, 142 Or App 341, 350, 922 P2d 677 (1996) (lack of evidence as to

whether the defendant could see what the officer was doing when the search occurred "goes against the state, because it has the burden of proving the lawfulness of the search").

Because the state did not prove that the search of the foil fell within the scope of defendant's consent to be searched, we conclude that the search was unlawful and that evidence of the contents of the foil should have been suppressed.

We next consider whether the evidence found in defendant's backpack should have been suppressed as well. As noted, early in the encounter, Cook asked defendant whether he would consent to a search; the only qualification on that request was Cook's and defendant's mutual understanding that the officer was looking for weapons. After discovering the opium in defendant's pocket, Cook specifically asked defendant for permission to search his backpack, which defendant gave.

Defendant argues that his later consent to the search of the backpack was the product of exploitation of the unlawful search of the foil in his pocket. The state contends, among other things, that defendant's initial consent to be searched for weapons included consent to a search of the backpack, so, given that that consent was obtained before the search of the foil, there is no exploitation concern here. Defendant counters that argument by asserting that the trial court implicitly found that his initial consent did not extend to his backpack, and he contends that we are bound by that finding.

■ At the outset, we reject defendant's last argument. First, we are not persuaded that the trial court determined that defendant's initial consent did not include his backpack. Defendant relies on the court's written findings that "[t]he search of defendant's person was done with the defendant's consent" and that he "subsequently knowingly, intelligently and voluntarily consented to a search of his backpack * * *." The trial court did not expressly address the limits of the scope of the initial consent; it merely determined that the search of defendant's person fell within those limits. The court's determination as to defendant's subsequent consent indicates only that defendant consented again; it is not inconsistent with the conclusion that defendant's initial consent

extended to his backpack. In all events, the scope of consent is a question of law, *Arroyo-Sotelo*, 131 Or App at 294, so, regardless of what the trial court determined on that point, we are not bound by it.

■        We turn to the ultimate question—whether defendant's initial consent to be searched included consent to a search of the backpack. If it did, the evidence discovered in the backpack was not a product of exploitation of the unlawful search of the foil in defendant's pocket and, thus, need not be suppressed. *See State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005) (even if the defendant establishes a "but for" relationship between evidence and prior unlawful police conduct, the evidence is admissible if the police obtained it independently of the violation of the defendant's rights).

As stated above, the scope of a person's consent to a search turns on what a reasonable person would have intended. *Fugate*, 210 Or App at 13. When the officer requesting consent specifies the subject of the search, the scope of the consent is interpreted to include those areas where the items that are the subject of the search might be found. *Arroyo-Sotelo*, 131 Or App at 197. Again, it is undisputed that a reasonable person would have understood Cook's initial request as a request for consent to search for weapons. Defendant placed no limitations on his consent, so it extended to any place that weapons might be found, including his backpack. Defendant did not withdraw his consent at any point. Accordingly, we conclude that Cook discovered the evidence in the backpack independently of the unlawful search of the foil in defendant's pocket. For that reason, the trial court correctly denied the motion to suppress with respect to that evidence.

In summary, defendant is entitled to a new trial on Count 2 in the indictment, pertaining to the opium discovered in the foil in his pocket. We affirm the conviction on Count 1, pertaining to the methamphetamine found in his backpack.

Reversed and remanded on Count 2; otherwise affirmed.